AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Red 2006 Chrysler 300
VIN: 2C3KA63H46H448969

)
)
)
)
)

Case No.   **22mr1546**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution and possession with intent to distribute controlled substances |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |
| 18 U.S.C. § 924 | Penalities |

The application is based on these facts:

The affidavit of Special Agent Shayne Beckford is incorprated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Shayne Beckford, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means).*

Date: 10/21/2022
_____

_____
*Judge's signature*

City and state:  Albuquerque, NM

B. Paul Briones, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
**Red 2006 Chrysler 300**
**VIN: 2C3KA63H46H448969**

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Shayne Beckford**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the Vehicle known as Red 2006 Chrysler 300 displaying a vehicle identification number (VIN) 2C3KA63H46H448969, hereinafter "Target Vehicle," further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and have been employed as such since March 2019. I am currently assigned to the Albuquerque, New Mexico Deputy Special Agent in Charge ("DSAC") field office.

3.     I am a graduate of the Federal Law Enforcement Training Center (FLETC) and a graduate of Homeland Security Investigations Special Agent Training (HSISAT) in Glynco, Georgia.  I received a Bachelor of Arts in Law & Justice in 2009 and a Master of Arts in Criminal Justice in 2012 from Rowan University. Prior to becoming a Special Agent, I worked for New Mexico State Police (NMSP) as a law enforcement officer for approximately 7 years. While employed with NMSP, I was a narcotics agent for approximately two years and participated in numerous drug and criminal investigations. I have received extensive training and

practical experience pertaining to federal criminal procedures, federal criminal statutes, United

States Immigration and Nationality law, United States Customs laws and regulations, and other

federal and state laws pertaining to, but not limited to: Alien Smuggling/Human Trafficking,

fraudulent document manufacture and sales; the importation and distribution of controlled

substances, firearms, commercial fraud, and conspiracy.

4.      I have been involved in an ongoing investigation regarding the distribution of

controlled substances, specifically Fentanyl and Heroin, and the possession of a firearm by a

felon by Joseph BALDONADO (BALDONADO) also known as "HAPPY."  Since the

investigation's inception, I, as well as other Special Agents and Task Force Officers with USMS,

and law enforcement officials from other agencies have obtained information regarding the

illegal drug trafficking activities of BALDONADO.

5.      I make this affidavit based upon my own personal knowledge, which is

substantially derived from my participation in the investigation, as well as that of fellow agents

and officers who have participated in the investigation.  In addition, I have developed

information I believe to be reliable from additional sources including:

a.      Information provided by Task Force Officers ("TFO"), Special Agents

        ("SA"), and Criminal Analyst of the Homeland Security Investigation, and

        other law enforcement officials ("agents"), including oral and written

        reports that I have received directly or indirectly from said investigators;

b.      Results of physical surveillance conducted by agents during the

investigation;

c.      A review of telephone toll records and subscriber information;

d.      Information derived from consensually recorded conversations;

e.      Information derived from lawfully intercepted telephone conversations and text messages;

f.      A review of driver's license and automobile registration records;

g.      Records from commercial databases; and

h.      Records from the National Crime Information Center ("NCIC").

6.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

7.      I believe there is probable cause that the SUBJECTS have committed, are committing, and will continue to commit offenses involving violations of, *inter alia:*

a.      21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

b.      21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances;

c.      18 U.S.C. § 922g – Possession of firearms by a person convicted of a crime punishable by imprisonment for a term exceeding one year;

## EVIDENCE SOUGHT DURING SEARCH

8.      Based on my training, experience and participation in this and in similar

3

investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

9.      Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

10.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly

store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

11.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

12.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

5

13.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

14.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

15.     Drug traffickers usually sell their product for cash.  Because large quantities of

drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

16.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

17.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills,

7

overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

18.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the

drug dealer is calling, and thus the identity of potential associates.

19.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

20.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

21.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

22.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic

storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

23.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

24.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found in Target Vehicle, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and

telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

25.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

26.     A list of items agents seek authority to seize is in Attachment B.

**ELECTRONIC MEDIA AND FORENSIC ANALYSIS**

27.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found in Target Vehicle, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a

computer, digital medium, or storage medium is found in Target Vehicle, there is probable cause

to believe those records will be stored on that computer, digital medium, or storage medium.

Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the

copying of electronically stored information, all under Rule 41(e)(2)(B).

28.     *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough

search of Target Vehicle for information that might be stored on electronic media often requires

the seizure of the physical electronic media and later off-site review consistent with the warrant.

In lieu of removing electronic media from the Target Vehicle, it is sometimes possible to make

an image copy of electronic media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the electronic media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the

form of documents and files that can be easily viewed on site.  Analyzing

evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time with Target

Vehicle could be unreasonable. Electronic media can store a large volume of

information.  Reviewing that information for things described in the warrant can

take weeks or months, depending on the volume of data stored, and would be

impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge

that might not be present on the search site.  The vast array of computer hardware

and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data with Target

Vehicle.  However, taking the electronic media off-site and reviewing it in a

controlled environment will allow its examination with the proper tools and

knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be

stored in a variety of electronic media formats that may require off-site reviewing

with specialized forensic tools.

29.  *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

electronic media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant.  The later review may require techniques, including but not limited to computer-assisted

13

scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is

found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

15

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

16

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of the Target Vehicle without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at Target Vehicle and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at Target Vehicle and reasonably believed by law enforcement to be a user of the device, to the

17

fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **PROBABLE CAUSE**

31.     In the week of September 5, 2022, Homeland Security Investigations (HSI) Special Agent (SA) Shayne Beckford learned from the United States Marshal Service (USMS) subject Joseph BALDONADO (BALDONADO) escaped from the Bureau of Prison (BOP) custody on Saturday, September 3, 2022, last seen on camera being picked up in a light blue Lexus sedan. Since that date USMS attempted to locate BALDONADO. BALDONADO had two confirmed active warrants for his arrest.

32.     Through communication with other Law Enforcement Agencies SA Beckford learned BALDONADO was dating a female subject identified as Desiree BENAVIDEZ (BENAVIDEZ). SA Beckford also learned BALDONADO was using a cell phone to communicate with people and deliver narcotics. SA Beckford also learned BALDONADO was seen on multiple occasion in the Valencia County Area in the months of September 2022 and October 2022 and was possibly staying in the Albuquerque Area. Through database checks SA Beckford learned BENAVIDEZ drove a red 2006 Chrysler 300 displaying a New Mexico (NM) license plate "NDN923."

33.     On Wednesday, October 19, 2022, while attempting to locate BALDONADO SA

Beckford observed unidentified male subject standing next to a red Chrysler 300 who appeared

to be fueling up a red Chrysler 300 at the ALON gas station located at 4321 Coors Blvd SW

Albuquerque, NM 87121. SA Beckford drove into the ALON gas station and saw the red 2006

Chrysler 300 displayed a NM license plate "NDN923." A data base check for NM license plate

"NDN923" returned to the registered owner BENAVIDEZ. SA Beckford and USMS personnel

began following Target Vehicle traveling south on Coors Blvd SW in Albuquerque, NM. USMS

Task Force Officer (TFO) Salcido observed that Target Vehicle was occupied by a male and

female subject.

34.     Target Vehicle was followed from Albuquerque, NM to the Los Lunas area and

surrounding towns. Target Vehicle visited multiple residences for short periods of time and

appeared to conduct abnormal driving behavior by driving slowly and turning down multiple

dead-end roads in what also appeared to be an attempt to identify if Target Vehicle was being

followed. Target Vehicle was observed pulling into the J&J Country Mart convenience store

located at 91 N El Cerro Loop, Los Lunas, NM 87031 where USMS TFO Salcido identified the

subject BALDONADO as the driver of the vehicle.

35.     Target Vehicle was then followed to an unknown residence located at 24 Viasa

Rd #8, Los Lunas NM 87031 were BALDONADO & BENAVIDEZ exited Target Vehicle and

entered the residence. USMS personnel surrounded the residence and conducted public

announcement telling BALDONADO to exit the residence. Shortly after BALDONADO,

BENAVIDEZ and several other subjects exited the residence. BALDONADO was arrested and

taken into custody by USMS.

36.    In plain view SA Beckford looked through the windows of Target Vehicle and noticed a bookbag behind the center console was open. In the open section of the bookbag SA Beckford saw what appeared to be plastic baggies indicative of drug trafficking. USMS Salcido also observed a glass pipe inside the vehicle near the center console.

37.    SA Beckford briefly spoke to BENAVIDEZ and learned BALDONADO was the driver of the vehicle, and the bookbag located inside the vehicle belonged to BALDONADO. The only items BENAVIDEZ claimed inside the vehicle was her pocketbook and cellphone. Target Vehicle was locked, sealed, and transported to the HSI Albuquerque Office by Curbside Towing where Target Vehicle was secured stored following HSI procedure.

38.    On Thursday, October 20, 2022, NMSP K9 Officer Joseph Garcia and narcotics K9 Zypher conducted an exterior search of Target Vehicle. After completing an exterior search of Target Vehicle SA Beckford was notified K9 Zypher alerted to the odor of narcotics inside Target Vehicle.

39.    I conducted a query of BALDONADO's & BENAVIDEZ' biographical information through criminal databases as well as open-source resources. I found BENAVIDEZ had no previous criminal history. I found BALDONADO had previously been issued FBI number XXXXX8VB0 and had multiple prior felony convictions. Specifically, in 20XX, BALDONADO pled guilty to violation of 21 USC 841 (b)(1)(B), Possession with Intent to Distribute 50 Grams of More of a Mixture and Substance containing Methamphetamine and was

committed to the custody of the United States Bureau of Prisons (BOP) for a total term of 60

months. In 2006 BALDONADO was charged with a New Mexico State violation of Escape from

Jail and was sentenced to nine months and twenty-two days county jail time. Additionally, in

2007, BALDONADO pled guilty to attempted armed robbery and was sentenced to a four-year

prison term in Valencia County.

## **CONCLUSION**

40.     I submit that this affidavit supports probable cause for a warrant to search the

Target Vehicle described in Attachment A and seize the items described in Attachment B.

Assistant United States Attorney Eva Fontanez reviewed and approved this search warrant

application.

Respectfully submitted,

Shayne Beckford
Special Agent
Homeland Security Investigations

[Subscribed and sworn to before me] or [Electronically signed and telephonically sworn]
on October 21, 2022:

HONORABLE B. PAUL BRIONES
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

## ATTACHMENT A

*Property to be searched*

The property to be searched is Red 2006 Chrysler 300 VIN: 2C3KA63H46H448969, hereinafter "Target Vehicle," further described as Red 2006 Chrysler 300 identified by New Mexico license plate "NDN923."

The search of the above Target Vehicle shall include the search of the entire vehicle.

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.SC. § 841, 21 U.S.C. § 846, & 18 U.S.C. § 922(g)(1) those violations involving BALDONADO and occurring after September 3, 2022, including:

1. Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.  Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said vehicle and/or other vehicles used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

2

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

During the execution of the search of Target Vehicle described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found in Target Vehicle and reasonably believed by law enforcement to be a user of a device found Target Vehicle, to the fingerprint scanner of the device; (2) hold a device

3

found in Target Vehicle in front of the face those same individuals and activate the facial

recognition feature, for the purpose of attempting to unlock the device in order to search the

contents as authorized by this warrant.